UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 3:98-cr-55(3)-RLM |
| | ) | |
| ROBIN PEOPLES | ) | |

OPINION AND ORDER GRANTING COMPASSIONATE RELEASE

Now age fifty, Robin Peoples has served twenty-two years of a 110-year sentence (or 1,329 months) imposed in December 1999 for four counts of bank robbery, four counts of using a firearm during a felony, two counts of destroying a vehicle by fire, and two counts of using fire to commit a felony. His sentence was the least allowed by law. Mr. Peoples's projected release date is April 2095, which would require him to reach the age of 123. The sentencing range for a defendant sentenced today for same conduct as Mr. Peoples would be 768 to 810 months, 600 months of which would necessarily be mandatory consecutive sentences by statute. Mr. Peoples seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A), relying primarily on the unreasonableness of his 1999 sentence when compared with today's standard of reasonableness.

An inmate petitioner seeking compassionate release must (1) exhaust his remedies within the Bureau of Prisons; (2) show that extraordinary and compelling reasons support compassionate release; and (3) persuade the court that compassionate release wouldn't be inconsistent with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). United States v. Gunn, 980 F.3d

1

1178 (7th Cir. 2020). More than thirty days have passed since Mr. Peoples submitted his request to the warden of the United States Prison at Terre Haute, so the government agrees that he has exhausted his remedies within the Bureau of Prisons. United States v. Sanford, 986 F.3d 779, 782 (7th Cir. 2021).

APPLICATION NOTE TO U.S.S.G. § 1B1.13

The government argues, apparently to preserve the issue for appeal, that the application notes to U.S.S.G. § 1B1.13 contain the only permissible definition of "extraordinary and compelling reasons." Section 3582(c) of Title 18 limits a court's power to modify a sentence to three situations:

- when the Sentencing Commission has reduced a sentencing range and made its amendment retroactive, 18 U.S.C. § 3582(c)(2);

- when allowed by a statute or Fed. R. Crim. P. 35, 18 U.S.C. § 3582(c)(1)(B); and

- when the court finds that extraordinary and compelling reasons warrant a reduction, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. § 3582(c)(1)(A).

The only policy statements addressing compassionate release are those accompanying U.S.S.G. § 1B1.13, the government's argument goes, so a compassionate release order can only issue if it consistent with those policy statements.

2

District courts in this circuit must reject the government's position. In United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020), our court of appeals recognized that although the Sentencing Commission has issued policy statements to address motions or determinations by the Director of the Bureau of Prisoners, the First Step Act authorized — for the first time — prisoners to file compassionate release motions with the court. The policy statement in U.S.S.G § 1B1.13 is self-limiting because it begins with "Upon motion of the Director of the Bureau of Prisons." With no quorum for the last few years, the Sentencing Commission hasn't issued any policy statement to address the meaning of "extraordinary and compelling" when a prisoner makes the motion.

When dealing with an inmate-generated motion for compassionate release, district courts in this circuit "must operate under the statutory criteria — 'extraordinary and compelling reasons' — subject to deferential appellate review." United States v. Gunn, 980 F.3d at 1180. This court, as it must, agrees with Mr. Peoples that the application note to U.S.S.G. § 1B1.13 doesn't provide the complete definition of "extraordinary and compelling reasons" and the First Step Act uses that phrase in 18 U.S.C. § 3582(c)(1)(A).

UNREASONABLENESS OF SENTENCE AS AN EXTRAORDINARY AND COMPELLING REASON

Mr. Peoples's argument that a sentence's unreasonableness can itself be an "extraordinary and compelling reason" for purposes of compassionate release relies in part on Section 403 of the First Step Act, which "clarified" the law.

When Mr. Peoples was sentenced in 1999, a conviction under § 924(c) required a sentence of at least five years, which had to be consecutive to any other sentence. That's true today, as well. The minimum penalty increased from five years to twenty years (now twenty-five) for each subsequent offense. Mr. Peoples was convicted of four separate bank robberies in 1997 and 1998; each robbery count carried a § 924(c) count. In 1999, the law was understood to mean that a "second or subsequent offense" was one committed after the first. So the § 924(c) count relating to the first robbery for which Mr. Peoples was convicted (the December 12, 1997 robbery) required at least a five-year sentence, which had to be served consecutively to all other sentences. The § 924(c) count on the second charged and convicted robbery (the first December 26, 1997 robbery) amounted to the second offense, requiring at least twenty more years to be added to the other sentences. And the § 924(c) counts on the third and fourth bank robberies (the second December 26, 1997 robbery and the February 17, 1998 robbery) amounted to third and fourth offenses, requiring still another forty years (at least) to be added to the other sentences. *See* United States v. Bennett, 908 F.2d 189, 194 (7th Cir. 1990). So under the law as it was understood in 1999, the four convictions under § 924(c) added sixty-five years to Mr. Peoples's sentence, and were responsible for 60 percent of Mr. Peoples's overall sentence.

Section 403 of the First Step Act "clarified" Congressional intent. Congress said that by "subsequent offense," it meant offenses committed after another § 924(c) conviction. One court described the change as "an extraordinary development in American criminal jurisprudence. A modern-day dark ages — a

4

period of prosecutorial 924(c) windfall courts themselves were powerless to prevent — had come to an end." United States v. Haynes, 456 F. Supp. 3d 496, 502 (E.D.N.Y. 2020). Congress specifically made its "clarification" non-retroactive, so Section 403 of the First Step Act doesn't directly benefit Mr. Peoples. Today's courts focus on the dates of the convictions and not the dates of the crimes. Had that been the law when Mr. Peoples was sentenced in 1999, the court would have had to impose four five-year terms, consecutively to each other as well as to the bank robbery sentences - 20 years instead of 65.

Mr. Peoples contends that application of the pre-First Step Act understanding produced a sentence that is unreasonable today. Until last week, it appeared likely that this court would reject Mr. Peoples's argument as not cognizant under the First Step Act. The judge to whom this case was assigned rejected a similar argument while also finding that a defendant's pre-2000 sentence was so unreasonable as to justify relief if only the law allowed. United States v. Watford, 2021 WL 533555 (N.D. Ind. Feb. 12, 2021).

In part because of its Watford holding, the court asked the parties to submit Mr. Peoples's relevant medical records. The parties' arguments centered on the reasonableness of his sentence as grounds for compassionate release, but the court noted reference in Mr. Peoples's clemency petition (included in his compassionate release submission) to health issues that might amount to extraordinary and compelling reasons for compassionate release. If that turned

out to be the case, the court could consider the 110-year sentence when it evaluated the § 3553(a) factors.

Nothing in the First Step Act limits a compassionate release motion to circumstances relating to COVID-19, but the risk posed by COVID-19 has been the ground most commonly raised in motions for compassionate release, and the papers before the court suggest no other ground besides the unreasonableness of Mr. Peoples's sentence. Mr. Peoples is fifty years old. A person without immunity between the ages of fifty and sixty-four is twenty-five times more likely to require hospitalization, and 440 times more likely to die compared to younger adults, if the person contracts COVID-19. Older Adults, C.D.C. (June 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. Mr. Peoples is obese (six feet tall, 269 pounds), and has documented histories of chronic hypertension, fatty liver disease/hepatic steatosis, and obstructive sleep apnea. The Centers for Disease Control have catalogued known comorbidities that increase the risk of severe illness from COVID-19; all of Mr. Peoples's conditions other than the sleep apnea is on the CDC list. Mr. Peoples cites studies that indicate that obstructive sleep apnea is a comorbidity even though it's not on the CDC list.

On the other side of the ledger, the medical records indicate that Mr. Peoples had COVID-19 from December 22 to January 5, 2021. From this, the government concludes that "the COVID-19 virus does not present a high risk of certain death to Mr. Peoples." Doc. No. 396, at 2. The science of COVID-19 is

always emerging, but at this point in the pandemic, it appears that the risk of reinfection after a bout of COVID-19 is low — 0.65 percent, according to a large Danish study reported in a leading medical journal. Steen Ethelberg, Sophie Madeleine Gubbels, Christian Holm Hansen, Daniela Michlmayr, & Kåre Mølbak, Assessment of Protection Against Reinfection with SARS-CoV-2 Among 4 Million PCR-Tested Individuals in Denmark in 2020: A Population-Level Observational Study, 397 THE LANCET 10280 (Mar. 27, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00575-4/fulltext. The study also noted a significantly greater risk for older people than for younger ones, though the study's age bracket was sixty-five and up.

The conversation would end at this point if Mr. Peoples's chances for compassionate release turned on the risk of severe illness from COVID-19. He has some comorbidities that greatly increase that risk – for people who haven't had COVID-19. But based on current understanding, his chances of reinfection, while not zero, are far lower than a person who has been neither infected nor vaccinated. Given his previous infection, Mr. Peoples's comorbidities don't amount to extraordinary or compelling reasons for compassionate release. And if this court ruled consistently with its earlier rejection in Watford of the proposition that a sentence's unreasonableness can alone justify compassionate release, the court would simply deny Mr. Peoples's motion.

Our court of appeals rejected the Watford view ten days ago, holding that a district court can, in an appropriate case, find extraordinary and compelling

reasons for compassionate release based solely on the unreasonableness – by contemporary standards – of the defendant's sentence. United States v. Black, --- F.3d ---, 2021 WL 2283876 (7th Cir., June 4, 2021). The issue came before the Black court somewhat indirectly: among the district court's grounds for denial of relief was that Mr. Black had served only thirteen years of his forty-year sentence. The court of appeals noted that because of the First Step Act's clarification of the stacking of sentences under § 924(c), a defendant sentenced today might receive a twenty-year sentence instead, and the thirteen years already served would be a much larger chunk of such a defendant's sentence. In explaining why courts can consider a sentence's reasonableness in light of the non-retroactivity of Section 403 of the First Step Act, the Black court wrote,

> That feature of the First Step Act shows that the district court was not *required* to reduce Black's sentence based on these changes. Congress's policy choice not to make the changes to § 924(c) categorically retroactive does not imply that district courts may not consider those legislative changes when deciding individual motions for compassionate release like this one. To the contrary, the purpose of compassionate release under § 3582 is to allow for sentencing reductions when there is no statute affording such a reduction but where extraordinary and compelling reasons justify that relief.

--- F.3d ---, ---, 2021 WL 2283876, at *3.

The court of appeals went on to cite with approval the decisions of sister circuits that reached the same conclusion. United States v. Owens, 996 F.3d 755 (6th Cir. 2021); United States v, Maumau, 993 F.3d 821 (10th Cir. 2021); United States v. McCoy, 981 F.3d 271 (4th Cir. 2020). The only court of appeals to differ was United States v. Bryant, 996 F.3d 1243 (11th Cir. 2021), which based its holding on the exclusivity of the factors in the application note to U.S.S.G. §

1B1.13 – a position at odds with our circuit precedent. <u>United States v. Gunn</u>, 980 F.3d 1178.

An unreasonable sentence can constitute an extraordinary and compelling reason for compassionate relief. So the next question for consideration is whether Mr. Peoples's 1999 sentence of 1,329 months is "unreasonable" when examined in 2021.

CONTEMPORARY REASONABLENESS OF THE 1,329-MONTH SENTENCE

Mr. Peoples earned a significant prison sentence with his conduct in 1997 and 1998, when he was a very dangerous criminal. He and his confederates robbed four banks in a two-month period. In the first, Mr. Peoples, Robert Caserez, Rafael Flores, and Robert Rojas took $25,000 from the Oak Manor branch of the National Bank of Detroit in Elkhart, Indiana, on December 12, 1997. Mr. Casarez, recruited by Mr. Peoples, was seventeen years old. Mr. Peoples brandished a Tech 9 assault firearm. They got away in a Ford Expedition they had stolen earlier that morning. Not far from the bank, they set fire to the Expedition and finished their getaway in Mr. Peoples's mother's car.

Mr. Peoples, Mr. Casarez (who had turned eighteen years old), and Mr. Flores robbed two banks in the morning of December 26, 1997. First, they stole $23,000 from a Lake City Bank in Elkhart; next, they stole about $13,000 from a Valley American Bank in Osceola. Mr. Peoples brandished the Tech 9 assault weapon, and Mr. Casarez brandished another gun during both robberies. They

9

fled the scenes in a Chevrolet Tahoe they had stolen earlier that morning. After the Valley American Bank robbery, they drove a short distance and set the Tahoe on fire, then went on in Mr. Peoples's mother's car.

Mr. Peoples, Mr. Casarez, and Mr. Rojas stole about $44,000 from the Concord Mall branch of the National Bank of Detroit in Elkhart on February 17, 1998. Mr. Peoples brandished the Tech 9. They briefly used an Oldsmobile Bravada they had stolen that morning as a getaway vehicle, and switched cars in the shopping mall parking lot. Mr. Peoples had tried to recruit two new participants – Christina Pessefall and Jamie Carrington to drive the second getaway car.

The bank employees involved in these robberies were terrified during, and long after, the events. Mr. Peoples shouted and swore at them throughout each robbery, sometimes pointing his weapon at them, sometimes holding his weapon to a teller's head. He threatened to kill employees if they didn't comply with his instructions. Some of the bank employees left the banking business altogether.

This fourth robbery was Mr. Peoples's idea. He wanted to get Mr. Rojas to Mexico because Mr. Rojas had been spending and speaking too freely. Mr. Peoples eventually drove Mr. Rojas to Mexico and left him there, frustrating the government's investigation. Besides placing Mr. Rojas beyond the government's reach, Mr. Peoples also tried to get other witnesses to lie for him. Mr. Peoples perjured himself at trial when testifying on his own behalf.

Mr. Peoples was arrested on a criminal complaint in September 1998 and indicted in October 1998. He was convicted at an eleven-day jury trial in January 1999 of four counts bank robbery, 18 U.S.C. § 2113(d), four counts of using a firearm in furtherance of a felony, 18 U.S.C. § 924(c), two counts of destroying a vehicle by fire, 18 U.S.C. § 844(h), and two counts of using fire to commit a felony, 18 U.S.C. § 844(i).

Sentencing guideline calculations were needed for only six of the twelve counts. Under the 1998 version, enhancements applied to the bank robbery counts for taking property from a financial institution, loss amounts exceeding $10,000, making death threats in each robbery, role in the offense, obstruction of justice, and (for the first robbery) using a minor, so the first robbery had an adjusted offense level of 31, while the other three had offense levels of 29. The two counts of malicious destruction of a vehicle by fire saw enhancements for losses exceeding $20,000, more than minimal planning, commission of the crime to facilitate other crimes, role in the offense, and obstruction of justice, producing adjusted offense levels of 22 for each of those two counts. The grouping rules then in effect produced a final adjusted offense level of 35. Mr. Peoples had no previous criminal convictions, so the sentencing guidelines required (they were mandatory then) a sentencing range of 168 to 210 on those six counts.

But the remaining counts increased the sentencing range by nearly a factor of seven. The first count of using a firearm in furtherance of a crime of

violence carried a mandatory minimum consecutive sentence of five years; under the law as it was understood then, the remaining three counts under § 924(c) each required a mandatory minimum sentence of twenty years, for a total of sixty-five years. The first count of using fire to commit a felony required a mandatory minimum sentence of ten years, and the second count required a mandatory minimum sentence of twenty years. Those six counts added 1,140 months, or 95 years, in addition to the 168 to 210 months for robbing the banks and destroying two vehicles. Sixty-five years (more than half of the sentence) was attributable to the practice of "stacking" sentences under § 924(c), which then required five years for a first offense and twenty years for second and subsequent offenses.

The court sentenced Mr. Peoples to the midpoint of the sentencing guidelines, or 189 months, plus 1,140 months on the mandatory minimum counts, for an aggregate sentence of 1,329 months. That's the sentence that Mr. Peoples is serving. He was 28 years old the day he was sentenced.

If someone replicated Mr. Peoples's crimes today and was sentenced under today's law, the sentence still would be long, but would be shorter by more than a third than the 1999 sentence. The guideline calculations would be the same, and the guidelines would recommend the same range of 168 to 210 months. The post-First Step Act § 924(c) counts would carry four consecutive five-year sentences – twenty years rather than sixty-five – and the § 844(h) counts would add ten and twenty years, respectively and consecutively, for another thirty

years. It would all add up to an aggregate sentencing range of 768 to 810 months, with 600 of those months generated by the statutory mandatory and consecutive minimum sentences.

Mr. Peoples reports that the average sentence in 2015 for an offender convicted of robbery and use of a firearm during the robbery was 168 months. Doc. No. 387, at 14. Mr. Peoples's stand-in would bring more robberies and more mandatory consecutive enhancements to the table.

Federal sentencing laws have changed in other ways, as well. Mr. Peoples was sentenced before the Supreme Court decided that the sentencing guidelines were advisory rather than mandatory. United States v. Booker, 543 U.S. 220, 258-266 (2005). When Mr. Peoples was sentenced, the court had to choose a sentence within the guideline range unless something unique to the case took the case out of the "heartland" of cases of its sort. *See, e.g.*, United States v. Jones, 278 F.3d 711, 716 (7th Cir. 2002) ("After choosing the applicable sentencing range, the district court could apply an upward departure if it found that Jones' behavior was outside of the "heartland" of conduct embodied by Guideline § 2J1.5."). So Mr. Peoples didn't ask for, and the court didn't consider, a sentence below the guideline range. The court imposed a sentence within the guideline range.

The guidelines no longer bind a sentencing court. The guidelines are understood to be advisory: today's sentencing courts seek a sentence that is reasonable within the meaning of 18 U.S.C. § 3553(a), looking first within the

range recommended by the Sentencing Guidelines, but free to look outside the advisory range, as well. *See* United States v. Carter, 961 F.3d 953, 955 (7th Cir. 2020) ("The Sentencing Guidelines are no longer binding, but the correct calculation of a defendant's guideline range is 'the starting point and the initial benchmark' for federal sentencing.").

Second, when Mr. Peoples was sentenced in 1999, the law was understood to mean that when deciding the sentence for the underlying felony (the crime in furtherance of which the firearm was used or carried), the sentencing court had to ignore the impending addition of five (or sixty-five) more years under § 924(c). So even had this court been free to look outside the guideline range for a reasonable sentence, the court couldn't have judged "reasonableness" with an eye toward the sixty-five years that had to be added because of the "stacked" § 924(c) counts. See United States v. Ikegwuoni, 826 F.3d 408, 410 (7th Cir. 2016) (citing United States v. Roberson, 474 F.3d 432, 436 (7th Cir. 2007)).

The Supreme Court rejected that doctrine in Dean v. United States, 137 S. Ct. 1170, 1176-1177 (2017) ("Nothing in § 924(c) restricts the authority conferred on sentencing courts by § 3553(a) and the related provisions to consider a sentence imposed under § 924(c) when calculating a just sentence for the predicate count."). That holding, like the First Step Act's anti-stacking provision, isn't retroactive, Worman v. Entzel, 953 F.3d 1004 (7th Cir. 2020), so it offers no direct help to Mr. Peoples. But Dean would apply to a defendant being sentenced today.

The firearm penalty would have been only one non-guideline factor a sentencing court would address today. In 1999, once it was established that the guidelines required a sentence of 1,308 to 1,350 months and that there were no grounds for a downward departure, a sentencing judge disinclined to impose a sentence longer than the mid-point of the range had little call to discuss sentencing factors commonly discussed today, such as the nature and circumstances of the crimes, the defendant's history and characteristics, the need for the sentence to reflect the seriousness of the crime, protect the public from the defendant, promote respect for the law, and deter the defendant and others from committing such crimes. Today, any or all of those factors could warrant a sentence below or far below (or above) the advisory guideline range.

Finally, today's defendant could argue that if, as the First Step Act says, Congress intends for a second or subsequent conviction under § 924 (c) to be something other than another count of indictment, the same construction should apply to the "stacking" provisions of § 844(h). If successful, that argument would shave another decade off the sentence for a defendant who did exactly what Mr. Peoples did.

Those thoughts inform the central question for compassionate relief: is Mr. Peoples's sentence so unreasonable under today's understanding of sentencing reasonableness to amount to an extraordinary or compelling reason for compassionate release? The court believes it is. Even before reaching the advisory nature of the sentencing guidelines, the ability to consider mandatory

15

consecutive statutory provisions when studying the guidelines, and the possibility of re-thinking the stacking provision of § 844(h), Section 403 of the First Step Act's clarification of stacking under § 924 (c) means that a reasonable sentence for today's version of Robin Peoples would be forty-five years less than what was required in 1999. No construct of "reasonableness" can encompass both a sentence of $x$ and a sentence of $x + 45$ years for the same conduct.

Mr. Peoples has satisfied his burden under 18 U.S.C. § 3582(c)(1)(A) to show an extraordinary and compelling reason for relief. It remains for him to persuade the court that compassionate release wouldn't be inconsistent with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). A grant of compassionate release would effectively convert Mr. Peoples's 110-month sentence to one of time served, or about twenty-two-and-a-half years of actual time served.

## STATUTORY SENTENCING FACTORS

The sentencing guidelines provide the starting point for every pursuit of a reasonable sentence. Gall v. United States, 552 U.S. 38, 49 (2007). As already explained, today's sentencing guidelines would recommend a sentencing range of 168 to 210 months for the six substantive counts, with another fifty years (600 months) required for the counts under §§ 924(c) and 844(h).

A sentencing court in 2021 would turn from the guideline calculation to the sentencing factors in 18 U.S.C. §3553(c), which this court also must consider in deciding whether to grant compassionate release.

16

Nature and Circumstances of the Offenses, § 3553(a)(1). Mr. Peoples's crimes were set forth earlier in this opinion – four armed robberies of banks in which the group he led got away with considerable money, in which he threatened the lives of bank employees, and in two of which he and his chosen band destroyed getaway cars by fire. Mr. Peoples lied at trial, tried to get others to perjure themselves for him, drove a confederate to Mexico so investigators couldn't reach him, and convinced a minor to participate in one of the robberies.

While bank employees suffered considerable psychological injury, no one was hurt during any of the robberies (or fires). Though firearms were carried and brandished in each robbery, no firearm was discharged.

The Defendant's History and Characteristics, § 3553(a)(1). When sentenced in 1999, Mr. Peoples had no other criminal convictions. He was a twenty-eight-year-old with a pregnant girlfriend, a high school diploma, good health, no history of steady substance abuse, and a history of mostly short-term factory jobs.

But everyone involved in Mr. Peoples's trial and sentencing likely would be astonished by what happened when he went to prison. He embarked on a superb and exemplary prison record. He has earned certificates in a variety of courses designed to help inmates adjust to the freedom Mr. Peoples might never see, including parenting, anger management, leadership, interpersonal skills, typing, accounting, music, and personal money management. He has learned to create databases, to fix machinery, and to handle a business's books.

Taking such courses might not be extraordinary for a person serving the functional equivalent of a life sentence. But this is: in his twenty-odd years in the Bureau of Prisons, he's never had a single disciplinary infraction. He has impressed members of the correctional staff to the extent that nine of them have written letters on his behalf. The judge to whom this case is assigned has served as a judge for forty-five years without seeing anything like that before. The correctional staff also describe a situation in which Mr. Peoples went above and beyond what would be expected of an inmate, at significant personal risk.

Mr. Peoples unsuccessfully applied to the President for clemency in 2016. The person described in that petition, with corroboration by prison records, correctional officers, and medical records, is a far different person than the 26-year-old who terrified tellers at four banks with threats to kill and a brandished semiautomatic firearm.

Need to Deter Criminal Conduct by Defendant and Others, § 3553(a)(2)(B). Armed robbery is a very serious crime that calls for serious penalties to deter the robber and other potential robbers. This factor supported a significant sentence in 1999 and still does. Mr. Peoples has been imprisoned for these crimes for nearly half his life.

Public Protection from the Defendant, § 3553(a)(2)(C). Mr. Peoples was a very dangerous young man when he was robbing banks at gunpoint in 1997 and 1998, and when he was trying to get witnesses to perjure themselves at trial for him. At age fifty today, Mr. Peoples might be thought to be reaching the time in

18

life in which people age out of criminal activity, but Sentencing Commission studies have found that offenders who have committed gun-related crimes engage in serious conduct and recidivate far more deeply into life than other offenders. The passage of time might affect the need to protect the public, but Mr. Peoples's age - either now or when he was robbing banks - doesn't.

But as discussed with respect to his history and characteristics, as dangerous a man as Mr. Peoples was when he was sentenced in 1999, he appears to pose a far lower than average risk of crime today,

Kinds of Sentences Available, § 3553(a)(3). This wasn't a concern in 1999, when the sentencing guidelines were understood to be mandatory. The only kind of sentence available for Mr. Peoples was a sentence between 1,308 to 1,350 months' imprisonment. The court added a five-year supervised term. Authority to grant compassionate release would leave the court a binary choice: the court could either leave Mr. Peoples in custody to serve as much of the rest of his sentence as his lifespan allows, or could effectively commute the sentence to time served and start Mr. Peoples on his five-year supervised release term.

The Range Recommended by the Sentencing Guidelines, § 3553(a)(4)(A). The mandatory guidelines range was 1,308 to 1,350 months under 1998 sentencing law; the advisory guideline range is 768 to 810 (including the mandatory 600 months) under the law as it's understood today.

Need to Reflect the Seriousness of the Offenses, § 3553(a)(2)(A). This factor ordinarily overlaps and virtually duplicates that analysis of the nature and

circumstances of the offense. This record presents no basis to distinguish those two factors. Mr. Peoples's crimes were very serious, and demand a substantial sentence.

Need to Promote Respect for the Law, § 3553(a)(2)(A). The public expects significant sentences for armed bank robbers, especially those who commit four armed bank robberies. Mr. Peoples received a significant sentence, consistent with the law as it existed and was understood at the time, in 1999. A significant sentence under the law as it exists and is understood today would be considerably less than what Mr. Peoples received in 1999. Under neither 1999 law nor 2021 law could the public expect a death sentence for an offender such as Mr. Peoples, and the law for which the sentence should promote respect includes the First Step Act's provisions for compassionate release.

Need to Provide Just Punishment for the Offenses, § 3553(a)(2)(A). This factor frequently overlaps and virtually duplicates the analysis of the nature and circumstances of the offense. This record provides no basis on which to distinguish the two factors. The offenses included no mitigation that would call for a different analysis.

The Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6). Two types of disparities are apparent. The rest of Mr. Peoples's bank robbery gang all chose to plead guilty and testify against Mr. Peoples; they received sentences of fourteen, fifteen, and twenty-one years -- sentences ranging from eighty-nine to ninety-six years less than what Mr. Peoples received. While troubling, it's not an

unwarranted disparity. The confederates were convicted of different charges, accepted responsibility for the crimes, and testified for the government. The sentencing guidelines and statutory enhancements, which were just as binding when Mr. Peoples's co-defendants were sentenced, produced the disparity between their sentences and Mr. Peoples's.

But this case presents another troubling disparity: as already explained, if a defendant identical in all respects to Robin Peoples committed crimes identical in all respects to what Mr. Peoples did 23 years ago and appeared in a federal court for sentencing in June 2021, and if the guideline range presented a reasonable sentence, his sentence would be at least forty-five years less than what Mr. Peoples received. That disparity might not be "unwarranted" in the sense federal sentencing law uses the term — each sentence would have been properly calculated under then-prevailing law — but no other word in the English language better describes it.

The Need to Provide Restitution to Any Victims, § 3553(a)(7). Mr. Peoples and his co-defendants all were ordered to make restitution to their victims. The parties' submissions don't mention those obligations, so the court assumes restitution has been made.

Need to Provide Rehabilitative Treatment, § 3553(a)(2)(D). Mr. Peoples appears to have received, and made the best of, the rehabilitative treatment the federal penal system has to offer. He no doubt will need the help of the probation officer on supervised release to transition into freedom.

The statutory sentencing factors provide no reason not to grant compassionate release to Mr. Peoples. He has made the showings § 3582c)(1)(A) requires him to make to provide the court with the discretion to grant compassionate release. It remains for the court to decide whether to exercise that discretion in favor of compassionate release.

### DISCRETION

Even with authority to grant Mr. Peoples relief, the court can't revise it to fit what might be reasonable under today's sentencing law. Granting a motion for compassionate release effectively converts a sentence to time served, with supervision to follow. A court ordinarily would hesitate because Mr. Peoples hasn't served even half his 1999 sentence. He hasn't even served half the roughly sixty-nine years to which his avatar would be sentenced today for the same crimes. But the court doesn't have the option to convert Mr. Peoples's sentence to something close to half his sentence, whether hypothetical or actual. The court can either order him freed within weeks, or leave him to serve until he breathes his last.

Given the testament of correctional staff whose job is to watch Mr. Peoples closely, the decades-long unblemished conduct record Mr. Peoples has assembled within the Bureau of Prisons, and the stunning unreasonableness of his 1999 sentence by today's standards, the court chooses to exercise its discretion under 18 U.S.C. § 3582 c)(1)(A) in Mr. Peoples's favor, and grant his

motion for compassionate release. Given the serious risk he once posed to the public, the court will add a requirement that he spend the first year of his five-year supervised release term on home detention.

ORDER

The court GRANTS Robin Peoples's motion for compassionate release [Doc. No. 387]. The defendant's previously imposed aggregate sentence of 1,329 months on Counts 1 through 12 of the indictment is reduced to time served. His five-year supervised release remains, and the court adds the following condition to the terms of his supervised release:

> The defendant shall serve a twelve-month term of home detention to begin within ten days of placement on supervision, with electronic monitoring (or an equally effective alternative form of surveillance), to ensure compliance with this condition, at his own expense through participation in a co-payment program administered by the probation office. During this time, defendant shall remain at his place of residence except for times specifically authorized in advance by the probation officer. Failure to pay these fees shall not be grounds for imprisonment unless the failure is willful. This condition is imposed as a substitute for imprisonment. It also reduces the risk of recidivism and provides public protection and defendant rehabilitation.

The remaining conditions of supervised release are unchanged.

23

This order is stayed for up to fourteen days, for the verification of the defendant's residence and/or establishment of a release plan, to make appropriate travel arrangements, and to ensure the defendant's safe release. The defendant shall be released as soon as a residence is verified, a release plan is established, appropriate travel arrangements are made, and it's safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe release, the parties shall immediately notify the court and show cause why the stay should be extended.

SO ORDERED.

ENTERED:   June 14, 2021

/s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court

cc:   R. Peoples
      USP Terre Haute

24